# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CHOICE ATM ENTERPRISES, INC., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 13-CV-359-JED-TLW |
| JOHN PETRIG, | ) |
| Defendant. | ) |

## OPINION AND ORDER

**I.   Background**

**A.   The Litigation**

The plaintiff, Choice ATM Enterprises, Inc. (Choice), initiated this litigation by the filing of a complaint for declaratory judgment. Choice sought a judicial determination that it owes the defendant, John Petrig, nothing. Petrig counterclaimed and asserted claims for breach of contract, fraud, joint venture, breach of fiduciary duty, and quantum meruit / unjust enrichment. Those claims arose out of a relationship between Choice and Petrig by which Petrig procured contracts with third parties for the placement of Choice's ATM machines, and Petrig was paid commissions on revenues from ATM transactions on those procured contract accounts. Choice stopped paying commissions to Petrig in 2012, which led to this dispute and litigation.

The parties have filed cross-motions for summary judgment on Petrig's counterclaims. In his motion for partial summary judgment (Doc. 63), Petrig seeks a liability determination in his favor on his contract and fraud claims. Choice's motion for summary judgment (Doc. 67) requests that the Court enter judgment against Petrig on all of his counterclaims.

### B. Relationship between Plaintiff and Defendant

Choice is a closely-held corporation based in Texas, in the business of installing, maintaining and managing Automated Teller Machines (ATMs) for government entities, financial institutions, casinos, hospitals, restaurants, convenience stores, and other entities. In early 2001, Choice engaged Petrig, an Oklahoma resident, as a sales representative because of his strong pre-existing business ties with Oklahoma tribal executives and decision makers. Petrig asserts that the parties reached "an express Agreement as to the terms of their relationship," which he calls the "Commission Agreement." (Doc. 63 at 3).

Choice denies that it and Petrig reached an express agreement "in as much as any such agreement was modified several times by Choice and Petrig." (Doc. 68 at 6). However, Choice does not dispute the following:

> Per the terms of the Agreement, Petrig agreed to procure accounts for the placement of Choice ATM machines, in exchange for which the Company agreed to pay him commissions for the ensuing transactions occurring at said accounts.
>
> The specific commission rate for each account is negotiated and agreed to by Choice ATM and its sales representatives on an account-by-account basis, as part of the original negotiating and procuring of each account.
>
> Choice ATM places ATM machines at commercial locations, and is paid a portion of the revenues generated from each individual machine transaction.
>
> The majority of ATM accounts Choice ATM has been able to procure have been low-volume, independent locations which Choice ATM refers to as "one-off" accounts, and which generate on average less than $400 in income to the Company each month.
>
> Choice ATM asked Mr. Petrig to attempt to procure Oklahoma tribal casino accounts for the placement of ATM machines.
>
> Mr. Petrig succeeded in personally procuring the lucrative Chickasaw Nation Enterprises account for Choice ATM business, obtaining an ATM Agreement between Choice ATM and the Chickasaw Nation executed on April 9, 2003.

> The Chickasaw Nation account quickly became Choice ATM's largest and highest grossing account.
>
> Since Mr. Petrig procured this windfall account, Choice ATM has received fees on tens of millions of ATM transactions occurring at the account.
>
> To this day, Choice ATM still enjoys payment on every single successful ATM transaction occurring at any Chickasaw Nation ATM location.
>
> The Chickasaw Nation account has produced more revenue to Choice ATM than all of the Company's other accounts – and, accordingly, more commissions payable to the sales associate responsible for the account.

(Doc. 63 at ¶¶ 4-16, 20; Doc. 68 at ¶¶ 3, 5 ["Choice does not dispute the factual statements in Paragraph Nos. 4-16" and 20]).

In its Amended Answer, Choice admitted that "the parties agreed that Petrig would solicit and procure accounts for ATM machines and would be paid on the basis of results and on a basis to be agreed between the parties from time to time and account by account." (Doc. 65 at ¶ 8). In its response brief, Choice expressly "acknowledge[d] that it entered into an agreement that solely authorized Petrig to secure business and Choice was to pay Petrig an amount per each transaction at the Chickasaw Nation." (Doc. 68 at 16). Notwithstanding the foregoing admissions and the fact that it paid Petrig commissions on ATM transactions from the Chickasaw Nation account for several years, Choice argues that "no agreement existed" because the agreement did not provide for a specific duration for the payment of commissions or the end of the parties' relationship. Thus, according to Choice, no oral contract was formed under Oklahoma law because the terms were not sufficiently definite. (*Id.* at 16-19).

It is undisputed that "[i]nstead of paying Mr. Petrig his agreed commission rate, Choice ATM unilaterally decided in January, 2012, to start paying Mr. Petrig in even, round monthly payment amounts determined by Company co-owner Mr. Von Merveldt, departing from the parties' longstanding practice and Agreement." (Doc. 63 at ¶ 82; Doc. 68 at ¶ 14). Von

Merveldt admitted in his deposition that "he unilaterally decided to change the parties' longstanding Commission Agreement in January, 2012, because he *suspected* there *might eventually be* a change coming later in the year to the amount of 'interchange' income the Company would receive from credit card companies." Von Merveldt also "admits that this potential interchange decrease had not actually occurred when he decided to go ahead and implement his unilateral reduction of Mr. Petrig's commission pay in January, 2012." (Doc. 63 at ¶¶ 82-84; Doc. 68 at ¶¶ 14 ["Choice does not deny the allegations in Paragraph Nos. 82-84"]). Choice stopped paying Petrig *any* commissions in December 2012, even though Choice never stopped receiving revenues from the Chickasaw Nation account, which continues to account for the majority of Choice's ATM transactions. (Doc. 63 at ¶¶ 88-89; Doc. 68 at ¶ 18). Petrig alleges that the failure to pay commissions since 2012 constitutes a breach of the parties' oral agreement. (Doc. 62 at 2 [First Cause of Action]).

John DiPalma, Choice's Vice President of Operations, testified that Choice had previously "bought out" the commission rights of another representative, and DiPalma believed that the representative was entitled to the buyout because "[h]e was generating commission on locations that he had obtained and wanted a lump sum." (Doc. 64-3 at 56, 59). In its response, Choice "denies the allegation ... that it was customary for Choice to buy out a sales-representative account," and cites Mr. Von Merveldt's affidavit, paragraph 19, as support. That affidavit does not refute the fact that Choice had previously purchased the commission rights of at least one other representative. Instead, paragraph 19 of the affidavit states only that Petrig's "termination does not involve buying the independent contractor out of the account, but relates to a stop payment on all further commissions." (Doc. 68-2 at ¶ 19).

### C. Alleged Fraud

Petrig's Second Cause of Action is a counterclaim for fraud. He alleges that, beginning in October, 2008 and continuing thereafter through 2012, Choice concealed from Petrig the actual number of ATM machines and transactions on the Chickasaw Nation account. (Doc. 62 at ¶¶ 33-39). According to Petrig, between October 2008 and December 2012, Choice "engaged in multiple intentional schemes to conceal from, and misrepresent to, Mr. Petrig the actual amount of ATM transactions occurring at his Chickasaw Nation account." (*Id.* at ¶ 40). The alleged fraudulent schemes included falsification of data on commission reports, concealing ATM machines added to the account, failing to accurately account for ATM transactions, and intentionally falsifying and transposing hundreds of ATM transaction figures on Petrig's commission reports such that "[o]n each of these hundreds of occasions, Choice ATM changed the actual transaction number to a falsified lower number, resulting in the under-payment of commissions to Mr. Petrig." (*Id.* at ¶¶ 42-46).

## II. Summary Judgment Standards

A party may move for summary judgment on any claim or defense. Fed. R. Civ. P. 56(a). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Id.* at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam).

### III. Petrig's Motion for Partial Summary Judgment

#### A. Breach of Contract Claim

Petrig asserts that he is entitled to a determination of liability on his breach of contract claim. The parties are in agreement that Oklahoma law applies to the employment contract. Pursuant to Oklahoma's rules of contract construction, a contract must be interpreted "to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." *Okla. Stat.* tit. 15, § 152. A contract must be interpreted in a manner as will make it operative, definite, reasonable, and capable of being carried into effect. *Id.* § 159. "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." *Id.* § 165. "A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." *Id.* § 163. Implied contracts are also recognized in certain situations under Oklahoma law and typically present factual issues for a jury. *See, e.g., Krause v. Dresser Ind., Inc.*, 910 F.2d 674, 678 (10th Cir. 1990) (affirming judgment on jury verdict awarding damages for breach of implied promise) (citing *Hinson v. Cameron*, 742 P.2df 549, 554-57 (Okla. 1987)).

While the Court agrees that Choice has been inconsistent as to whether and to what extent the parties had an agreement to pay commissions to Petrig for ATM transactions on accounts procured by Petrig, there are issues of fact that remain with respect to the parties' intentions at the time of contracting. For example, there remain issues as to the intended duration of the contract. There are also factual disputes as to whether subsequent additions of ATMs to the Chickasaw Nation account were intended to be credited to Petrig for purposes of payment of commissions and whether the oral agreement required Petrig to perform the work required to maintain the account in order to continue to receive commissions for the life of the account. The parties also have presented conflicting versions of the parties' intent on the issue of the impact, if any, on Petrig's commissions, in the event of amendments to the Chickasaw Nation accounts, or reductions in the transaction fees paid to Choice from that account.

Applying the foregoing authorities to the summary judgment record, there are fact issues which must be determined by a jury with respect to Petrig's breach of contract counterclaim.

**B.  Fraud Counterclaim**

Petrig asserts that the Court should determine, as a matter of law, that Choice committed fraud by presenting falsified commission reports to Petrig, and by concealing newly added ATM machines, and transactions on those machines, from Petrig. Choice acknowledges errors in the Commission Reports, but denies that those errors were intentional, and Choice denies that it had any duty to advise Petrig about newly added ATMs or to pay him commissions on all of them.

Under Oklahoma law, "fraud is a generic term embracing the multifarious means which human ingenuity can devise so one can get advantage over another by false suggestion or suppression of the truth." *Croslin v. Enerlex, Inc.*, 308 P.3d 1041, 1045 (Okla. 2013). "When fraud is alleged, every fact or circumstance from which a legal inference of fraud may be drawn

is admissible." *Id.* Actual fraud is "the intentional misrepresentation or concealment of a material fact, with an intent to deceive, which substantially affects another person." *Id.* Constructive fraud "is a breach of a legal or equitable duty to the detriment of another, which does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose." *Id.* at 1045-46.

Although there is evidence suggesting that the hundreds of transpositions of numbers on commission reports were likely *not* the result of an accident, Choice disputes that these errors were intentional and has presented testimony that they were accidental. Thus, there is a dispute of material fact as to whether Choice's inaccurate reports were knowingly falsified or were the result of unintentional mistakes. In addition, as noted above, there are genuine disputes of fact as to whether Choice was contractually obligated to pay commissions to Petrig for all transactions on ATM machines that were added to the Chickasaw Nation account into the future. If a jury were to find that there was an agreement requiring the payment of commissions on ATMs subsequently added to the Chickasaw Nation account, then alleged concealment of those machines and transactions upon them could be found to be material for purposes of establishing Petrig's fraud claim. In short, there are issues of material fact which prevent the entry of summary judgment on Petrig's fraud claim.

## IV. Choice's Motion for Summary Judgment

### A. Breach of Contract

Choice seeks summary judgment on Petrig's breach of contract claim, alleging that there was no definitive agreement. In the alternative, Choice argues that any contract was indefinite in

time and therefore was terminable at will.[1]  Petrig asserts that the duration was not indefinite, and that the contract required that he receive commissions on the Chickasaw Nation ATM account only for so long as Choice still had that account.

The record in this case, construed in Petrig's favor, prevents the entry of summary judgment on the contract claim.  As noted above, Choice has admitted the basic terms of an agreement with Petrig, and those terms are not vague or indefinite.  Moreover, the parties do not dispute that Petrig was an independent contractor, not an employee of Choice, which would render the employment at will doctrine inapposite.  As noted above, the evidence reveals disputes of fact as to the intended duration of the contract.  Choice argues that the contract was indefinite and therefore terminable at any time of Choice's choosing.  A reasonable jury could reject Choice's claim, based upon Choice's own conduct in paying Petrig for several years and in buying out another sales representative's commission rights.  There are genuine disputes of material fact preventing summary judgment on the breach of contract claim.

**B.    Joint Venture**

Petrig has alleged that "the Chickasaw Nation ATM account is a Joint Venture between Choice ATM and John Petrig under Oklahoma law," and that Choice has obligations to Petrig continuing for so long as the venture exists or until Petrig conveys his rights in the joint venture. (Doc. 62, Third Cause of Action).  Under Oklahoma law, a "joint venture is a special combination of two or more persons where, in some specific venture, a profit is jointly sought without any partnership or corporate designation; and, by special agreement, the parties may limit their respective profits and provide which particular part of the expenses each should bear before participation in any profit. Corporations have the power to enter into joint ventures with

---

[1] Although Choice generally asserts an indefinite or undefined contract, it has not moved for summary judgment under the statute of frauds.

9

individuals." *Price v. Howard*, 236 P.3d 82, 90-91 (Okla. 2010). "While the chief characteristic of a joint venture is the seeking of joint profits from a transaction, no single factor is sufficient to establish that parties are engaged in a joint venture." *Id.* at 91. There are three elements for establishing a joint venture: 1) a joint interest in property; 2) an express or implied agreement to share profits and losses of the venture; and 3) action or conduct showing cooperation in the project. *Id.* "The existence of a joint venture presents a question of fact." *Id.*

Choice seeks summary judgment on the Joint Venture claim, based upon Choice's arguments that there was no agreement between the parties and that the arrangement between Choice and Petrig did not call for Petrig to share in financial losses related to the Chickasaw Nation ATM account. The Court has already determined that there are issues of fact precluding summary judgment with respect to the parties' agreement, which would apply to Choice's first argument for summary judgment on the joint venture claim. In addition, Petrig has presented evidence from which a reasonable jury could find that he did share in certain losses or deductions associated with the Chickasaw Nation account. (Doc. 71 at 19-22 and evidence cited therein).

Applying Oklahoma law to the evidence presented, and construing the evidence in favor of Petrig, there are genuine disputes of material fact regarding the existence of a joint venture, and summary judgment is inappropriate on this claim.

### C. Quantum Meruit / Unjust Enrichment

Petrig also alleges that Choice was unjustly enriched as a result of profits generated for Choice in the millions of dollars from Petrig's procurement of the Chickasaw Nation ATM account, while refusing to pay Petrig for his services in procuring the account. (Doc. 62, Fifth Cause of Action). Choice seeks summary judgment on this claim, arguing that Petrig cannot recover on a quantum meruit claim on a theory of express agreement, because Petrig has not

identified any obligations outside the scope of the express contract. Petrig notes that he is entitled to maintain alternative theories of recovery such that, if the jury does not determine the existence of a valid contract relating to the Chickasaw Nation ATM account, quantum meruit is an alternative theory of recovery. Petrig has presented evidence that Choice has received millions of dollars from the Chickasaw Nation account and, according to Petrig, Choice would not have received anything if not for Petrig's services, yet Choice unilaterally determined to stop paying him what Choice was obligated to pay. Again, the Court concludes that there are issues of fact preventing summary judgment on this issue.

### D. Breach of Fiduciary Duty

Petrig's Fourth Cause of Action is for breach of fiduciary duty, based upon his allegations that Choice owed and breached fiduciary duties in handling the accounts Petrig procured and in its payment of commissions owed to Petrig. (Doc. 62). Choice seeks summary judgment on this claim, alleging that Petrig cannot establish the existence of a fiduciary duty owed by Choice to Petrig.

"The [Oklahoma] courts have generally refrained from defining the particular instances of fiduciary relationship to such a degree that new cases might be excluded. The expression 'fiduciary or confidential relationship' has a broad meaning and includes technical relations and informal relations in which one person trusts and relies on another." *Krug v. Helmerich & Payne, Inc.*, 320 P.3d 1012, 1017-18 (Okla. 2013). A confidential relationship or fiduciary duty "exists whenever trust and confidence are placed by one person in the integrity and fidelity of another," and arises "when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness,

dependence, or trust, justifiably reposed; in both, an unfair advantage is possible." *In re Estate of Beal*, 769 P.2d 150, 155 (Okla. 1989).

Choice has not cited any legal authority establishing that Petrig's relationship with Choice cannot, as a matter of law, support a fiduciary duty claim. While Choice argues that Choice did not owe any fiduciary duty to Petrig because he was an independent contractor, Choice has cited no legal authority providing that an independent contractor may never be owed a fiduciary duty. In any event, Petrig has presented evidence that, as a result of their relationship, Petrig trusted Choice to administer the funds it received in a fair and honest manner, but failed to do so, which generally supports a fiduciary duty claim. Choice's motion for summary judgment on this claim is denied.

### E. Fraud

Choice asserts that Petrig cannot establish fraud. However, Petrig has presented evidence which, construed in his favor, a jury could find amounted to fraud. The hundreds of transpositions of numbers of ATM transactions on his commission reports, which amounted to significant reductions in Petrig's commissions, present an issue of fact for the jury. In addition, there are issues of fact with respect to the alleged concealment of the addition of new ATMs and transactions from those ATMs, as noted above with respect to Petrig's own summary judgment motion. As previously noted, fraud involves all of the "multifarious means which human ingenuity can devise so one can get advantage over another by false suggestion or suppression of the truth." *Croslin*, 308 P.3d at 1045. "When fraud is alleged, every fact or circumstance from which a legal inference of fraud may be drawn is admissible." *Id.* Under the applicable standards, summary judgment is inappropriate on Petrig's fraud claim, because there are genuinely disputed fact issues material to the determination of the claim.

## V. Conclusion

For the foregoing reasons, Petrig's Motion for Partial Summary Judgment (Doc. 63) is **denied**. Choice's Motion for Summary Judgment (Doc. 67) is likewise **denied**.

SO ORDERED this 17th day of November, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE